**26-10124-F**

# United States Court of Appeals
### *for the*
# Eleventh Circuit

———— ◆ ————

UNIVABS SOLUTIONS PRIVATE LIMITED,

*Petitioner-Appellee,*

– v. –

THE RADIOLOGY GROUP, LLC,

*Respondent-Appellant.*

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
Case No: 1:25-cv-03932-VMC (Hon. Victoria M. Calvert)

## APPELLANT'S OPENING BRIEF

David I. Schoen
Simon J. Schoen
SCHOEN LAW FIRM, LLC
3151 Maple Drive NE
Atlanta, Georgia 30305
(404) 365-5042
schoenlawfirm@gmail.com
simon@schoenlawfirm.com

*Counsel for Respondent-Appellant*
*The Radiology Group, LLC*

CP COUNSEL PRESS    (800) 4-APPEAL • [815364]

# Table of Contents

**Page**

Table of Authorities ........................................................................................ iii

Statement Regarding Oral Argument ...........................................................vi

Jurisdictional Statement ..................................................................................1

Statement of the Issues....................................................................................2

Statement of the Case......................................................................................3

 A. The Course of Proceedings ...................................................3

 B. Statement of the Facts ...........................................................5

  1. Background ....................................................................5

  2. TRG and Univabs Entered Into a Services Agreement That Provided for Georgia Law to Govern the Agreement and Any Disputes Arising Out of it .........................7

  3. Following a Dispute the Parties Went to Arbitration, as Dictated by the Services Agreement ......................................8

  4. The Arbitrator Found That Verma had No Fiduciary Duties to TRG, Despite Verma Being a Manager of TRG..........................................................................................9

 C. Standard of Review ........................................................13

Summary of the Argument............................................................................14

Argument.......................................................................................................16

 I. The Arbitrator Made an Impermissible Modification of the Operating Agreement, Not an Interpretation, in Violation of the Law, and Leading to an Unfair and Unjust Outcome ...................16

  A. Introduction................................................................16

  B. The Arbitrator's Actions Constituted a Modification of the Operating Agreement, Not an Interpretation, in Violation of 9 USC 10(a)(4)................................................18

i

1.      As a Threshold Matter, the Relevant Language Should Not Be Subject to Interpretation ........................23

2.      Even if the Agreement Were Open to Interpretation, the Arbitrator Still Modified the Contract Rather than Interpreting it..........................29

      a.      The Arbitrator Ignored the Express Intent of the Parties.........................................................32

      b.      The Arbitrator Ignored Georgia Law and Did Not Give "Maximum Effect" to the Freedom of Contract.............................................36

C.      The Arbitrator's Ruling and the Decisions Related to That Ruling Could Have Far-Reaching Negative Effects.........................................................................40

D.      Under the FAA, The District Court Had the Authority to Modify the Award to Promote Justice and Should Have Done so ...........................................................................41

II.      The District Court Failed to Properly Apply Georgia Arbitration Law ............................................................................42

Conclusion ......................................................................................47

## Table of Authorities

**Page(s)**

**Cases:**

*ABCO Builders v. Progressive Plumbing*,
282 Ga. 308 (2007)............................................................................................45

*Anheuser-Busch, Inc. v. Local Union 744, IBT*,
280 F.3d 1133 (7th Cir. 2002)................................................................ 32, 39

*Banderas v. Doman*,
224 Ga. App. 198 (1997) ..................................................................................45

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995) ..........................................................................................18

*Friedler v. Stifel, Nicolaus & Co.*,
108 F.4th 241 (4th Cir. 2024) ..........................................................................20

*Gherardi v. Citigroup Global Mkts., Inc.*,
975 F.3d 1232 (11th Cir. 2020)......................................... 13, 18, 19, 20

*Gulfstream Aerospace Corp. v. Oceltip Aviation 1 Pty Ltd.*,
31 F.4th 1323 (11th Cir. 2022)......................................................... 43, 44

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
552 U.S. 576 (2008) ..........................................................................................19

*Internal Med. Alliance, LLC v. Budell*,
290 Ga. App. 231 (2008) ..................................................................................26

*Kahn v. Smith Barney Shearson Inc.*,
115 F.3d 930 (11th Cir. 1997)..........................................................................20

*Montes v. Shearson Lehman Bros.*,
128 F.3d 1456 (11th Cir. 1997).......................................................................19

*Original Appalachian Artworks, Inc. v. JAKKS Pac., Inc.*,
718 F. App'x 776 (11th Cir. 2017)......................................... 21, 29, 31

*Oxford Health Plans LLC v. Sutter*,
569 U.S. 564 (2013) ..........................................................................................29

*Peebles v. Terminix Int'l Co., LP*,
2021 WL 5894857 (11th Cir. Dec. 14, 2021).................................................19

*Romano v. John Hancock Life Ins. Co. (USA)*,
   120 F.4th 729 (11th Cir. 2024)........................................................ 28, 38

*Sears, Roebuck & Co. v. Teamsters Local Union No. 243*,
   683 F.2d 154 (6th Cir. 1982)..............................................................21

*Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662 (2010) ................................................. 18, 20, 24, 25, 29

*Sweatt v. Int'l Dev. Corp.*,
   242 Ga. App. 753 (2000) ....................................................................45

*USAA Sav. Bank v. Goff*,
   170 F.4th 1051 (7th Cir. 2026) .........................................................21

*Visionary, Books + Café, LLC v. Bank Ozk*,
   2025 U.S. App. LEXIS 21022, 2025 WL 2390155
   (11th Cir., August 18, 2025), *cert denied*, *Visionary v. Bank Ozk*,
   2026 U.S. LEXIS 740 (U.S., Feb. 23, 2026)............................ 13, 18, 20

*Wachovia SEC, LLC v. Brand*,
   671 F. 3d 472 (4th Cir. 2012).............................................................20

*Warrior & Gulf Nav. Co. v. United Steelworkers of Am., AFL–CIO–CLC*,
   996 F.2d 279 (11th Cir. 1993).............................................................22

*Wells v. Wells-Wilson*,
   360 Ga. App. 646 (2021) ....................................................................45

*Wiregrass Metal Trades Council AFL-CIO v.*
   *Shaw Env't & Infrastructure, Inc.*,
   837 F.3d 1083 (11th Cir. 2016)............................. 19, 21, 22, 24, 29, 31

**Statutes and Other Authorities:**

9 U.S.C. § 1 ...........................................................................................1

9 U.S.C. § 10(a) ..................................................................................19

9 U.S.C. § 10(a)(4)................................................. 14, 15, 18, 19, 20

9 U.S.C. § 11 ................................................................................ 41, 42

9 U.S.C. § 16 .........................................................................................1

9 U.S.C. § 203 .......................................................................................1

28 U.S.C. § 1291 ........................................................................................1

11th Cir. R. 28-1(h)(i)(ii) ..........................................................................5

11th Cir. R. 28-5 .......................................................................................1

O.C.G.A. § 9-9-1 .....................................................................................43

O.C.G.A. § 9-9-13 ...................................................................................20

O.C.G.A. § 9-9-13(b) ..............................................................................44

O.C.G.A. § 9-9-13(b)(3) ..........................................................................45

O.C.G.A. § 9-9-13(b)(5) ..........................................................................45

O.C.G.A. § 13-2-2(2) ......................................................................... 36, 46

O.C.G.A. § 13-2-3 .......................................................................... 32, 36, 46

O.C.G.A. § 14-11-301 ..............................................................................25

O.C.G.A. § 14-11-305 ....................................................................... 26, 27, 38

O.C.G.A. § 14-11-305(1) ..................................................................... 26, 27

O.C.G.A. § 14-11-305(4) ..........................................................................27

O.C.G.A. § 14-11-307 ....................................................................... 17, 26, 38

Fed. R. App. 28(a)(7) .................................................................................5

**<u>Statement Regarding Oral Argument</u>**

Appellant TRG requests oral argument in this case. The Court would benefit from holding oral argument, under Rule 34, Federal Rules of Appellate Procedure, for a number of significant reasons. This case presents a classic example of an arbitrator overstepping the appropriate role and modifying, rather than interpreting a material term of a contract between the litigating parties. If the judgment below is affirmed, this case will highlight the injustice of the deference given to arbitrators even when the arbitrator was objectively wrong. If the judgment below is affirmed, the message will be that arbitrators can act with total impunity, even in instances in which they remove language from a contract and ignore explicit testimony by both parties that directly contradicts what they later find to be the intent of the parties.

The judgment below reflects a manifest injustice completely undermining the right of the parties to freely enter into a contract. Oral argument will assist the Court in discerning why the arbitrator's actions in this case constituted a modification and not an interpretation of a material contract term and why allowing it to stand would carry the deference accorded to arbitrators in this Circuit to an absurd level and an unjust result.

vi

## Jurisdictional Statement[1]

The parties agreed that the District Court had jurisdiction pursuant to 9 U.S.C. § 203 since the matter is governed by The Convention of the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). This Court has jurisdiction to hear this appeal from the District Court's final judgment granting the Appellee's motion to confirm arbitration award under 28 U.S.C. § 1291 as well as under 9 U.S.C. § 16, as there was an order confirming an award subject to 9 U.S.C. § 1, *et seq* and a final decision with respect to an arbitration that is subject to 9 U.S.C. § 16.

The District Court's Order and Judgment were filed on November 12, 2025. (ECF #30 & 31). Appellant was granted an extension of time to file its notice of appeal by January 16, 2026. (ECF #38). Appellant timely filed its notice of appeal on January 14, 2026. (ECF #39). This Appeal is from a final order and judgment disposing of all parties' claims. (*See* ECF 30 & 31).

---

[1] This Brief complies with 11th Cir. R. 28-5 References to the Record. The document and page numbers are the ones that appear in the header generated by the district court's electronic filing system.

**Statement of the Issues**

There are two issues before this Court on appeal:

I.    Whether the district court erred by finding that the arbitrator simply interpreted a material term of the contract between the parties, rather than impermissibly modifying a material term of the contract between the parties?

II.   Whether the district court erred by applying the wrong law in using the Federal Arbitration Act and should have applied the Georgia Arbitration Act instead when the contract expressly provided for Georgia law to be applied?

## Statement of the Case

### A. The Course of Proceedings

On March 9, 2023, Univabs Solutions Private Limited ("Univabs") submitted a demand for arbitration against The Radiology Group, LLC ("TRG"), bringing claims for breach of contract, suit on account, and attorney's fees and litigation expenses. (ECF #1-2).

On May 2, 2023, TRG submitted its Answer and Counterclaim, denying Univabs' claims in full and asserted counterclaims for conflicting interest transaction, fraud, unjust enrichment, punitive damages, and attorney's fees and litigation expenses. (ECF #1-3).

The parties proceeded with the arbitration process, including discovery and depositions, and on May 23, 2025, the arbitrator entered the final arbitration award in favor of Univabs. (ECF #6-1).

On July 15, 2025, Univabs filed a Petition to Confirm Arbitration Award in the U.S. District Court for the Northern District of Georgia (ECF #1).

On August 4, 2025, TRG filed an emergency Motion to Stay the arbitration award (ECF #4). The Motion to Stay was Granted that same day (ECF #5).

On August 25, 2025, TRG filed a Motion to Vacate the Arbitration Award (ECF #6). TRG's attorney affidavit and accompanying exhibits 1-206 span from ECF #8-22. TRG also filed its Answer on August 25, 2025 (ECF #23).

On September 8, 2025, Univabs filed its Response in Opposition to TRG's Motion to Vacate the Arbitration Award (ECF #24). Univabs also filed its Response to its Petition to Confirm Arbitration Award on September 8, 2025 (ECF #25).

On September 22, 2025, TRG filed its Reply to Univabs' Response to TRG's Motion to Vacate the Arbitration Award (ECF #27).

Univabs filed a Motion for Oral Argument and for Expedited Consideration of the pending motions before the Court on September 22, 2025 (ECF #28).

TRG filed its Response to the Motion for Oral Argument and Expedited Consideration on October 6, 2025 (ECF #29).

The Court issued its Order on November 12, 2025, Denying TRG's Motion to Vacate, Denying as Moot the Motion for Oral Argument, and Granting Univabs' Petition to Confirm the Arbitration Award (ECF #30). The Judgment was also entered on November 12, 2025 (ECF #31).

On December 19, 2025, TRG filed an Emergency Motion for Extension of Time to File Notice of Appeal (ECF #35). Univabs filed a Response in Opposition on January 2, 2026 (ECF #36). TRG filed a Reply to Univabs' Response on January 9, 2026 (ECF #37).

On January 13, 2026, the Court entered its Order Granting TRG's Motion for Extension of Time to File Notice of Appeal (ECF #38).

TRG filed its Notice of Appeal on January 14, 2026 (ECF #39).

## B. Statement of the Facts

The following is a summary of facts in the record below that are directly relevant to the issues in this appeal. Fed. R. App. 28(a)(7); 11th Cir. R. 28-1(h)(i)(ii). Other relevant facts will be discussed in the Argument section.

### 1. Background

TRG and Univabs conducted business together from 2012 until January 2023. (ECF #6-3 at 14). Univabs provided radiology services from India to TRG in the form of "templating" and "pre-read" services, which were then utilized by TRG to service its hospital clientele. (ECF #6-3 at 14).

In November 2011, Vikas Verma ("Verma") invested in TRG, and secured himself a position as a fiduciary-manager. (ECF #6-3 at 14). Verma served in that role from November 1, 2011, until November 30, 2020. (ECF #6-3 at 7). As manager, Verma was in control of finances and all vendor payments for TRG. (ECF #6-3 at 8) (*See also* ECF #9-7 at 311). That role included payments to Univabs. (ECF #6-3 at 14). Verma made a salary of $250,000 a year as manager of TRG. (ECF 6-3 at 15).  As a manager of TRG, Verma, by definition and in practice, was privy to inside, proprietary information about the inner-workings of TRG, its pricing, profit margins and much more.

TRG knew that Verma, as a businessman, had other investments and wanted to be able to continue pursuing other investments. As a result, they included a

clause in TRG's Operating Agreement, binding on Verma and TRG, that would enable him to do so, while also memorializing their agreement and mutual understanding that Verma would nevertheless still owe duties to TRG. This Operating Agreement was made and entered into in November 2011, and signed by Verma. (ECF #9-9 at 35). The Operating Agreement plainly and unequivocally reflects their agreement that Verma owed TRG duties, flowing from his fiduciary and managerial role with TRG, while permitting him to take on duties as well in connection with the other investments he intended to pursue simultaneously. This clause stated, in pertinent part:

> 5.13 <u>Managers Have No **Exclusive** Duty to Company</u>. Except for Anand Lalaji and Robb Kolb, each of whose exclusive duty shall be with the Company, a Manager shall not be required to manage the Company as the Manager's sole and **exclusive** function and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company.

(*See* ECF #9-9 at 12) (Emphasis added). Though TRG did not know it at the time, TRG later learned, and Verma testified to the fact that he was on both sides of the business relationship between Univabs and TRG (ECF #9-8 at 32). Verma actually was an owner of Univabs, but never disclosed this to TRG. While the two companies were engaged in discussions over a deal, Verma disclosed inside information to Univabs about what TRG was willing to pay (ECF #9-8 at 66).

**2. TRG and Univabs Entered Into a Services Agreement That Provided for Georgia Law to Govern the Agreement and Any Disputes Arising Out of it**

Univabs and TRG entered into a Radiology [Outsourced] Services Agreement (the "Services Agreement") on January 31, 2022. (ECF #1-1). Under the Services Agreement, Univabs contracted to provide radiology services to TRG and TRG contracted to pay for services rendered according to the fee schedule in the Services Agreement. (ECF #1-1). The Agreement contained a provision regarding disputes which provided for arbitration to take place in Georgia under Georgia law:

> 7.6 GOVERNING LAW. This Agreement and the construction and interpretation thereof shall be[ ] governed by the laws of the State of Georgia, U.S.A. This Agreement is made in Georgia and shall be governed and construed according to the laws of Georgia without regard to its conflicts of laws principles. All disputes, controversies or claims which relate in any way to this Agreement will be resolved by arbitration in Atlanta Georgia, by a single arbitrator appointed jointly in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitrator shall be knowledgeable in the area of information technology consulting. The arbitrator's award shall be final and binding, and judgment on the award may be entered in any court of competent jurisdiction but may only include damages consistent with the limitations in this Agreement.

(ECF #1-1 at 9).

7

**3. Following a Dispute the Parties Went to Arbitration, as Dictated by the Services Agreement.**

On March 9, 2023, Univabs filed a Demand for Arbitration with the American Arbitration Association ("AAA"). (ECF #1-2). TRG filed a counterclaim arguing that:

> Claimant owes Respondent in excess of $2,000,000 for overpayment of services at rates incurred under false pretenses in conflicting interest transactions that may be set aside and damages awarded under applicable law. These parties have been doing business with each other since 2013, with Claimant providing radiology services to Respondent. At that time, Vikas Verma was a Manager of Respondent and also a director and officer of Claimant. Mr. Verma determined the pricing on behalf of both parties — that is, on the one hand on behalf of Claimant as a director and officer, and on the other hand, on behalf of Respondent in his fiduciary capacity as Manager — all to the significant detriment of Respondent. Unbeknownst to Respondent until recently, Claimant was in fact charging Respondent an unfair greater than 100% mark-up over its internal cost — translating to a $2,000,000 overpayment.

(ECF #1-3 at 2).

On May 23, 2025, the AAA's Arbitrator issued a Final Award ("Award") granting Univabs $620,840.57 for breach of contract, $94,422.00 in pre-award interest, and post judgment interest, and further providing that Respondent recover nothing on its counterclaims. (ECF #6-1 at 33–35).

8

### 4. The Arbitrator Found That Verma had No Fiduciary Duties to TRG, Despite Verma Being a Manager of TRG.

As noted above, Vikas Verma was a manager of TRG. (ECF #6-3 at 7). He served in that role from November 1, 2011 until November 30, 2020. (ECF #6-3 at 7). As manager, Verma was in control of finances and all vendor payments for TRG. (ECF #6-3 at 8) (*See also* ECF #9-7 at 311). Verma made a salary of $250,000 a year as manager of TRG. (ECF 6-3 at 15). As a manager of TRG, Verma, by definition and in practice, was privy to inside, proprietary information about the inner-workings of TRG, its pricing, profit margins and much more.

As mentioned above, TRG only later learned, and Verma testified to the fact, that he was on both sides of the business relationship between Univabs and TRG (ECF #9-8 at 32). Verma actually was an owner of Univabs (ECF #24 at 2), but never disclosed this to TRG. While the two companies were engaged in discussions over a deal, Verma disclosed inside information to Univabs about what TRG was willing to pay (ECF #9-8 at 66). Furthermore, while still a manager of TRG, Verma told the people at Univabs that he thought he could push Anand Lalaji (meaning TRG) to give Univabs a "10 percent bump" regarding the pricing being discussed. (ECF #9-8 at 62-64). This clearly breached his duties to TRG, both based on his illicit trade in corporate secrets and by knowingly and intentionally

9

providing the inside information to Univabs, knowing he was doing so to TRG's extreme financial detriment.

Perhaps the greatest irony here is that Verma testified that part of his responsibilities for TRG was "controlling cost" (ECF #9-7 at 309), and that he wanted to make sure neither TRG nor Univabs had an unfair advantage (ECF #9-8 at 44). As things played out, he was singularly responsible for Univabs gaining an unfair advantage by providing them with trusted inside information about TRG, which allowed Univabs to leverage that information to charge a higher price than it otherwise would have charged TRG, thereby increasing its profit margin at TRG's expense and to its detriment to the tune of millions of dollars. (*See* ECF #6-3 at 19-21).

At the heart of this case and the injustice arising from the arbitrator's decision, upheld by the lower court, is that the arbitrator held that TRG failed to prove a fiduciary or confidential relationship existed between Verma and TRG. (ECF #6-1 at 26). This is absolutely irreconcilable with the record in the case and, indeed, is contradicted expressly, not just by the Operating Agreement, but by the testimony of the parties, including, most significantly, Verma's own testimony unequivocally acknowledging his duties to TRG.

On three occasions, under oath, spanning two different arbitration hearings in March 2025, in which the arbitrator was present, Verma admitted that he

(Verma) owed fiduciary duties to TRG. (ECF #9-7 at 311 and #9-8 at 40 and 50-51).

During those arbitration hearings, Verma also admitted to intentionally acting on both sides of the Univabs-TRG business relationship (ECF #9-8 at 32), clearly favoring himself and Univabs to the detriment of TRG. Verma knew how much TRG was willing to pay for services and used that to cause TRG to pay Univabs more than what Univabs would otherwise have sought for its services. (*See* ECF #9-8 at 63-64). Among the documents exposing this were internal communications between Verma and his partners at Univabs, Rahul and Jayant Bhandari, who are also his nephews, in which Verma told Univabs that he could get Anand Lalaji (TRG) to give Univabs a "10 percent bump" regarding the pricing being discussed. (*See* ECF #9-8 at 63-64).

Verma also expressly testified at depositions to having fiduciary duties to TRG, and to having "equal" duties to TRG and Univabs. (*See* ECF #9-7 at 311; ECF #9-8 at 40 and 50-51).

The arbitrator ignored these multiple sworn admissions by Verma expressly acknowledging his duty to TRG.

The arbitrator largely based his finding of no duty on his outright modification of Section 5.13 of the Operating Agreement, which, once again, reads as follows:

11

> 5.13 <u>Managers Have No **Exclusive** Duty to Company</u>. Except for Anand Lalaji and Robb Kolb, each of whose exclusive duty shall be with the Company, a Manager shall not be required to manage the Company as the Manager's sole and *exclusive* function and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or ventures.

(*See* ECF #9-9 at 12) (Emphasis added).

The arbitrator completely eliminated the word "*exclusive*" from Section 5.13 and determined that this provision:

> thereby **eliminates** in respect of Manager Vikas Verma **the existence of any fiduciary duties** and liabilities to Respondent, specifically the embodied duty of loyalty and the avoidance of conflicting interests arising out of any of Vikas Verma's business interests in respect of Claimant Univabs and arising out of any of his activities related to those business interests of Claimant Univabs.

(ECF #6-1 at 22).

By completely removing the word "exclusive," the Arbitrator did not just "modify" the Operating Agreement, he materially rewrote the Operating Agreement, and impermissibly concluded that Verma had **zero** fiduciary duties to, and no confidential relationship with TRG. (ECF No. 6-1 at 26 & 28). The arbitrator found that Section 5.13 "clearly and unambiguously" provided Verma a

12

relative "*carte blanche*" in how he was to carry out his "duty." (ECF No. 6-1 at 21). There is no basis whatsoever for such a modification or the conclusion to which it led, and it is absolutely at odds with and irreconcilable with the express bargained for language of the Operating Agreement. The arbitrator absolutely exceeded his powers by re-writing the Operating Agreement and completely changing the parties' express intentions and understanding.  Indeed, both parties testified unequivocally that Verma had a duty to both companies. (*See e.g.,* ECF #9-7 at 311; ECF #9-8 at 40 and 50-51).

TRG did not pay the money that the arbitrator awarded to Univabs, and these proceedings followed.

### C. Standard of Review

This Court reviews this appeal *de novo*. *Visionary, Books + Café, LLC v. Bank Ozk*, 2025 U.S. App. LEXIS 21022, 2025 WL 2390155 (11th Cir., August 18, 2025), *cert denied*, *Visionary v. Bank Ozk*, 2026 U.S. LEXIS 740 (U.S., Feb. 23, 2026), *citing*, *Gherardi v. Citigroup Global Mkts., Inc.*, 975 F.3d 1232, 1236 (11th Cir. 2020).

13

## Summary of the Argument

The arbitrator exceeded his powers, thereby violating the FAA (9 USC 10(a)(4)), when he made an improper modification to a valid contract between the parties in this case.

Vikas Verma was a manager of TRG, while also – unbeknownst at the time to TRG – the owner of Univabs, a company that TRG did significant business with over the span of more than a decade. Verma used his position and insider knowledge of TRG to determine the pricing between the parties, all to TRG's significant detriment. Verma told Univabs to charge a higher price than it otherwise would have because he knew exactly what TRG was willing to pay, causing TRG to pay significantly higher rates to Univabs than it otherwise would have. All this was done in clear violation of Verma's fiduciary duties under Georgia law.

In fact, Verma admitted under oath that he understood at all times that he had a duty to both TRG and Univabs, including explicitly admitting to having fiduciary duties to TRG. Inexplicably, the arbitrator ignored those admissions and expressly modified a material term of their agreement, rendering the term "no exclusive duty" to mean that Verma owed TRG no fiduciary duty at all. That is irreconcilable with the express bargained for language and with Verma's own sworn admissions.

14

Despite the admissions of Verma and the clear violations of Georgia law, the arbitrator modified the contract to find that Verma owed no fiduciary duties whatsoever to TRG.

The parties had contracted that Verma, a businessman who had many other interests and investments, would not have an "exclusive duty" to TRG, thereby allowing him to continue pursuing other investment opportunities. Nowhere did the contract release him from his fiduciary duties under Georgia law. The contract also specifically stated that Georgia law applied.

The District Court mistakenly found the arbitrator's removal of the word "explicit" to find no fiduciary duty at all to be an "interpretation" of the contract and therefore not in violation of the FAA. By ignoring the parties' stated intent, as well as Georgia law on the matter, the arbitrator "modified" the contract in violation of 9 USC 10(a)(4).

Furthermore, despite the contract expressly calling for Georgia law to apply, the District Court held that the Georgia Arbitration Act, which would have clearly caused the arbitrator's award to be vacated, did not apply to this case. Instead, the District Court held that the Federal Arbitration Act applied in spite of the contract calling for Georgia law to control.

15

**Argument**

I.   **The Arbitrator Made an Impermissible Modification of the Operating Agreement, Not an Interpretation, in Violation of the Law, and Leading to an Unfair and Unjust Outcome**

**A. Introduction**

This case arises out of a business relationship turned sour. From 2012 until early 2023, Univabs Solutions Private Limited ("Univabs") provided radiology services to TRG based on a written contract between the parties. (ECF #6-3 at 7). At the center of this business relationship was Vikas Verma, who was in control of both companies – a fact he concealed from TRG. (ECF #6-3 at 7). Unknown to TRG, Verma owned and controlled Univabs since 2007. (ECF #6-3 at 7). In 2011, Verma invested in TRG and secured substantial financial control as a fiduciary-Manager, subject to a written operating agreement executed in November 2011. (ECF #6-3 at 7). Verma was a Manager of TRG from November 1, 2011, until November 30, 2020. (ECF #6-3 at 7).

TRG and its CEO Anand Lalaji have denied throughout that they had any knowledge that Verma was an owner of Univabs during his time as manager of TRG from 2011 through 2020. (*See e.g.,* ECF #6-3 at 18).

Verma was TRG's Manager in control of finances and all vendor payments. (ECF #6-3 at 8). Through that role, Verma gained knowledge and information that he then provided to Univabs so that Univabs was able to overcharge TRG for

16

services rendered across those more than nine years that they were in business together. (*See* ECF #9-8 at 63-64). Eventually, TRG grew wise to this and stopped paying Univabs.

In March 2023, Univabs commenced arbitration, claiming $620,840.57 in unpaid invoices. (*See* ECF #1-2) TRG in turn made a counterclaim for over $2,000,000 for fraud associated with improper conflicting interest transactions under O.C.G.A. § 14-11-307. (*See* ECF #1-3).

It is also important to note that the District Court applied the Federal Arbitration Act ("FAA") to this matter, rather than the Georgia Arbitration Act ("GAA"). (*See* ECF #30 at 6, "the Court finds the FAA, not the Georgia Arbitration Act, applies to this case.").

The District Court held so for three reasons. First, the District Court found that this case fell under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention. (ECF #30 at 6). Second, since the Convention applies, recognition of the award is a matter of federal, not state law. (ECF #30 at 7). The third reason, which will be discussed further below, was Eleventh Circuit precedent. (ECF #30 at 7).

Since the lower court applied the FAA, this brief will discuss why the arbitrator's actions violated the FAA, and why as a result the arbitration award must be vacated.

17

**B. The Arbitrator's Actions Constituted a Modification of the Operating Agreement, Not an Interpretation, in Violation of 9 USC 10(a)(4)**

TRG knows and acknowledges that an arbitrator's award is entitled to a great deal of deference. *Visionary, Books + Café, LLC v. Bank Ozk*, 2025 U.S. App. LEXIS 21022, 2025 WL 2390155 (11th Cir., August 18, 2025), *cert denied*, *Visionary v. Bank Ozk*, 2026 U.S. LEXIS 740 (U.S., Feb. 23, 2026).[2]

As the lower court noted, "Under the FAA, federal courts have limited authority to vacate or modify an arbitration award." *Gherardi v. Citigroup Glob. Mkts. Inc.*, 975 F.3d 1232, 1236 (11th Cir. 2020). "Vacatur is allowed 'only in very unusual circumstances,' and only in the circumstances enumerated in the statute." *Id.* (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)).

Arbitrators do not exceed their powers when they make errors, even "a serious error." *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). The "sole question" is "whether the arbitrator (even arguably) interpreted the parties' contract [including the Rules the parties contracted to apply], not whether she got [their] meaning right or wrong." *Gherardi*, 975 F.3d at 1238

---

[2] An irony presented by this case is that the decisions of this and other courts narrowly limiting the ability of a party to challenge the validity of an arbitrator's award is that to hold otherwise purportedly would "make meaningless the parties' bargained-for provisions" envisioning the finality of an arbitrator's decision. *Visionary, Id*. Here, it is the arbitrator's decision that completely undermines the bargained-for material term in the Operating Agreement reflecting the intention and understanding of all parties that Verma had duties to TRG, just not exclusive duties.

18

(quoting *Wiregrass Metal Trades Council AFL-CIO v. Shaw Env't & Infrastructure, Inc.*, 837 F.3d 1083, 1088 (11th Cir. 2016)). "Vacatur under § 10(a)(4) 'is permitted only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice.'" *Peebles v. Terminix Int'l Co., LP*, 2021 WL 5894857, *2 (11th Cir. Dec. 14, 2021) (quoting *Gherardi*, 975 F.3d at 1237).

Under Section 10(a) of the FAA, federal courts are authorized to vacate an arbitral award in four instances:

1) where the award was procured by corruption, fraud, or undue means;
2) where there was evident partiality or corruption in the arbitrators, or either of them;
3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[3]

---

[3] This Court previously also recognized three non-statutory bases recognized in this Circuit for setting aside an arbitrator's decision, where the decision: (1) is arbitrary or capricious; (2) is in manifest disregard of the law; or (3) is violative of public policy. *See Montes v. Shearson Lehman Bros.*, 128 F.3d 1456, 1458-1459, n.5 (11th Cir. 1997). However, since the decision in *Hall St. Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576 (2008), this Court has held that these non-statutory bases

It is this fourth category, "exceeding their powers," that the arbitrator violated in our case. As will be detailed further, "[u]nder the FAA, a court must vacate an award where the arbitrators exceeded their power." *Kahn v. Smith Barney Shearson Inc.*, 115 F.3d 930, 933 (11th Cir. 1997) (citing 9 U.S.C. § 10(a)(4)). *See also Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671-672 (2010) ("an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator 'exceeded [his] powers,' for the task of an arbitrator is to interpret and enforce a contract, not to make public policy.").

The Eleventh Circuit, has stated that "[t]he arbitrator acts within her authority when she even arguably interprets a contract, and she exceeds her authority when she modifies the contract's clear and unambiguous terms."

---

are no longer valid. *Gherardi v. Citigroup Global Mkts., Inc.*, 975 F.3d 1232, 1236, n. 3 (11th Cir. 2020). There is a split among the Circuits as to their continued validity as non-statutory bases for setting aside an arbitrator's decision. *See, e.g. Friedler v. Stifel, Nicolaus & Co.*, 108 F.4th 241 (4th Cir. 2024) (Manifest Disregard continues to be a non-statutory basis); *Wachovia SEC, LLC v. Brand*, 671 F. 3d 472, 481, n.7 (4th Cir. 2012) (collecting cases). TRG argues herein that these three non-statutory bases require overturning the arbitrator's award in order to preserve the arguments. However, based on this Circuit's position on the applicability of the non-statutory bases, TRG argues first and foremost that the District Court's judgment must be reversed based on the violation of the statutory basis set forth at 9 U.S.C. § 10(a)(4). TRG would note that the Georgia Arbitration Code expressly recognizes "manifest disregard of the law" as a basis for setting aside an arbitrator's award. *See* O.C.G.A. § 9-9-13; *Visionary*, 2025 U.S. App. LEXIS 21022.

*Wiregrass Metal Trades Council AFL-CIO v. Shaw Environmental &
Infrastructure, Inc.*, 837 F.3d 1083, 1088 (11th Cir. 2016).

The starting point for the analysis of whether it was interpretation or
modification is "looking at the relevant language . . . and asking, as a threshold
matter, whether that language is open to interpretation." *Id.* "If the language is
open to interpretation, we must then determine whether the arbitrator engaged in
interpretation or modification of that language." *Original Appalachian Artworks,
Inc. v. JAKKS Pac., Inc.*, 718 F. App'x 776, 784 (11th Cir. 2017) (internal citations
removed) (citing to *Wiregrass* 837 F.3d at 1090).  Ignoring the plain language of an
agreement is not an "interpretation;" it is an impermissible exceeding of an
arbitrator's powers and requires vacating a decision so reached by an arbitrator.
*USAA Sav. Bank v. Goff*, 170 F.4th 1051 (7th Cir. 2026) (reversing judgment that
had confirmed arbitration award, rejecting claim that arbitrator interpreted
agreement where arbitrator ignored plain language of the agreement); *Sears,
Roebuck & Co. v. Teamsters Local Union No. 243*, 683 F.2d 154 (6th Cir. 1982)
(same; arbitrator is not free to disregard plain language of an agreement under the
guise of interpretation or to dispense his own "brand of industrial justice.");

The Eleventh Circuit further laid out the analysis as follows: Courts "must
defer entirely to the arbitrator's interpretation of the underlying contract no matter
how wrong [they] think that interpretation is." *Wiregrass* 837 F.3d at 1087.

21

However, "an arbitrator 'may not ignore the plain language of the contract.'" *Id.* at 1088 (quoting *Warrior & Gulf Nav. Co. v. United Steelworkers of Am., AFL–CIO–CLC*, 996 F.2d 279, 281 (11th Cir. 1993)). The arbitrator here ignored the plain language of the Operating Agreement.

The operative portion of the Operating Agreement at issue in this appeal bears repeating here:

> 5.13 <u>Managers Have No ***Exclusive*** Duty to Company</u>. Except for Anand Lalaji and Robb Kolb, each of whose exclusive duty shall be with the Company, a Manager shall not be required to manage the Company as the Manager's sole and ***exclusive*** function and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or ventures.

(*See* ECF #9-9 at 12).

In issuing his award in this case, the arbitrator completely, inexplicably, and impermissibly eliminated the word "***exclusive***" from Section 5.13 and determined that this provision:

> thereby ***eliminates*** in respect of Manager Vikas Verma ***the existence of any fiduciary duties*** and liabilities to Respondent, specifically the embodied duty of loyalty and the avoidance of conflicting interests arising out of any of Vikas Verma's business interests in respect of

22

> Claimant Univabs and arising out of any of his activities related to those business interests of Claimant Univabs.

(ECF #6-1 at 22).

The arbitrator further somehow found that the provision resulted in "excepting its Manager Vikas Verma from any and all legal duties and liabilities, including fiduciary ones, to [TRG]…" (ECF #6-1 at 22). There is no basis whatsoever for this action and he had no power or authority to re-write the agreement and remove a material term placed in the Operating Agreement for a specific purpose.

The language in Section 5.13 was clear. "[A] Manager shall not be required to manage the Company as the Manager's sole and *exclusive* function and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company." (*See* ECF #9-9 at 12). All that the contract called for was allowing Verma to pursue other business interests, such that his duties were not exclusively owed to TRG; but nowhere did it absolve him of his clear and acknowledged fiduciary duties to TRG.

1. **As a Threshold Matter, the Relevant Language Should Not Be Subject to Interpretation**

The arbitrator and District Court took the fact that the Operating Agreement does not explicitly detail Managers' fiduciary duties to mean that it was automatically open for interpretation. (*See* ECF #30 at 12, stating that "the

23

Agreement does not clearly delineate the scope of the duties of non-exclusive managers, meaning it is a matter of interpretation.").

But that completely ignores the rest of what the arbitrator and District Court knew – the contract clearly calls for Georgia law to govern the contract. (*See* ECF #30 at 2). And as the District Court pointed out, "an arbitrator may not ignore the plain language of the contract." (ECF #30 at 11, citing to *Wiregrass* 837 F.3d at 1088) (internal citations omitted).

In this sense, our case is analogous to the Supreme Court case of *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.,* 559 U.S. 662 (2010). In *Stolt-Nielsen*, the arbitrator found the contract to be silent on a certain issue and came to its own conclusion on the matter. *Id*. at 666. The Supreme Court there held that "instead of identifying and applying a rule of decision derived from the FAA or either maritime or New York law, the arbitration panel imposed its own policy choice and thus exceeded its powers." *Id*. at 676-677.

In our case, if the arbitrator decided that the Agreement was silent on the issue of Managers' duties, he would have been wrong. But, assuming there were some basis for it, the correct thing to do would be to look to the applicable law. In this instance, Georgia law is directly on point.

Instead, the arbitrator arbitrarily and capriciously decided to impose his own policy choice and decide that the "silence" meant that Verma as a Manager of TRG

24

had no fiduciary duties at all. Had the arbitrator instead correctly looked to Georgia law to decide the issue of fiduciary duties, as the court in *Stolt-Nielsen* instructed, the outcome would have been much different. However, the operating agreement here was not "silent" by any means on this issue. Had the contracting intention of the parties been to eliminate any duty for Verma to TRG they clearly could have written exactly that. Instead, by qualifying "duties" with "exclusive," by definition the parties recognized that Verma had legal duties to TRG, while he also could have duties to others. This, of course, is consistent with Verma's repeated express sworn admissions that he understood at all times that he owed duties to TRG. (*See ECF* #9-7 at 311; ECF #9-8 at 40 and 50-51).

The arbitrator's conclusion to the contrary cannot be reconciled with the record and most notably not with Verma's sworn admissions. His decision is the epitome of a modification of the terms and therefore must be set aside.

In addition to Verma's express admission that he owed duties to TRG under the operating agreement, he owed duties to TRG as a matter of law as well. The arbitrator, at most, gave passing lip service to the law; by his actions he manifestly, arbitrarily, and capriciously disregarded it.

Under Georgia law, all managers of an LLC owe certain fiduciary duties to the LLC and its members. *See* O.C.G.A. § 14-11-301 *et seq.* These include the

25

duties of loyalty and care. *See* O.C.G.A. § 14-11-305. Under O.C.G.A. § 14-11-305(1):

> In managing the business or affairs of a limited liability company: A member or manager shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

Furthermore, under O.C.G.A. § 14-11-307, managers may not engage in "conflicting interest transactions" unless they first:

> (**1**) Disclose[] to the members or managers voting on the transaction the existence and nature of his or her conflicting interest and inform[] them of the character of and limitations imposed by that duty […] and
> (**2**) Play[] no part, directly or indirectly, in their deliberations or vote.

TRG has contended throughout arbitration and litigation that it did not know of Verma's conflicting interest here. (*See e.g.,* ECF #6-3 at 18). TRG knew that, as a businessman with many interests, Verma invested in other companies; but at no point prior to arbitration was TRG ever made aware that Verma owned Univabs. (*See e.g.,* ECF #6-3 at 18).

The fact that managers of an LLC owe fiduciary duties to the LLC and its members is also expounded upon through caselaw. *See Internal Med. Alliance, LLC v. Budell,* 290 Ga. App. 231, 236-237 (2008) ("Managing members of a LLC

26

owe fiduciary duties to the LLC and its member investors") (also citing to O.C.G.A. § 14-11-305(1)).

That means that there are inherent fiduciary duties imposed on managers of an LLC. However, such duties can be contracted around if the parties so wish pursuant to O.C.G.A. § 14-11-305. The Georga Code provides that:

> To the extent that, pursuant to paragraph (1) of this Code section or otherwise at law or in equity, a member or manager has duties (including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager:
> (A) The member's or manager's duties and liabilities may be expanded, restricted, or eliminated by provisions in the articles of organization or a written operating agreement; provided, however, that no such provision shall eliminate or limit the liability of a member or manager:
> (i) For intentional misconduct or a knowing violation of law; or
> (ii) For any transaction for which the person received a personal benefit in violation or breach of any provision of a written operating agreement;

O.C.G.A. § 14-11-305(4).

This latter part was also part of the Operating Agreement. Section 5.9 provides that a Manager can be liable for loss or damages from: "(a) Intentional misconduct, (b) knowing violation of law, or (c) a transaction from which such Manager received an improper personal benefit in violation or breach of the provisions of this Operating Agreement or the Georgia Act." (ECF #9-9 at 11).

27

The Georgia Code makes it very clear that such fiduciary duties are a default under Georgia law. **You do not have to contract for fiduciary duties to apply. They apply whether expressly written or not.** Here, of course, the parties expressly memorialized the fact in the Operating Agreement that there were duties.

To avoid any fiduciary duties, the parties would have to specifically contract around them. **That is exactly why the parties included that Verma did not have an exclusive duty to TRG. It was so Verma would be allowed to invest in other companies with no conflict. They did not contract for the release of any other fiduciary duties.**

If Verma did not otherwise have any fiduciary duties or legal obligations to TRG, why would they have to specifically contract that he did not have an "exclusive" duty to TRG?  The law does not assume contract terms are to be read as superfluous. *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 742 (11th Cir. 2024) (A "contract should be interpreted to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.").

The relevant Georgia law is clear. Fiduciary duties automatically apply. Therefore, the Operating Agreement was not open to interpretation on that matter.

**2. Even if the Agreement Were Open to Interpretation, the Arbitrator Still Modified the Contract Rather than Interpreting it**

The District Court found that the Operating Agreement was open to interpretation because it does not directly address Verma's duties or responsibilities. (*See* ECF #30 at 12, "Here, the Agreement does not clearly delineate the scope of the duties of non-exclusive managers, meaning it is a matter of interpretation.").

This is incorrect as a matter of law and of fact. If Verma had no fiduciary duties to TRG, then why did Section 5.13 need to be included at all?

Even if the Agreement were open to interpretation, the arbitrator's actions constituted a modification of the Operating Agreement, not an interpretation.

In determining whether something is an interpretation or a modification, the sole question is whether the arbitrator actually interpreted it, not whether the arbitrator was right or wrong. *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013); *see also Stolt-Nielsen*, 559 U.S., at 671 ("It is not enough . . . to show that the [arbitrator] committed an error — or even a serious error."); *Original Appalachian Artworks, Inc*., 718 F. App'x at 784 (quoting *Wiregrass* 837 F.3d at 1087) (If the arbitrator interpreted the contract, then "we must defer entirely to the arbitrator's interpretation of the underlying contract no matter how wrong we think that interpretation is.").

29

As has been discussed above, in deciding the award, the arbitrator found that Verma had no duties whatsoever to TRG. (ECF #6-1 at 21). The arbitrator largely based his finding of no duty on Section 5.13 of the Operating Agreement, which, again, reads as follows:

> 5.13 <u>Managers Have No ***Exclusive*** Duty to Company</u>. Except for Anand Lalaji and Robb Kolb, each of whose exclusive duty shall be with the Company, a Manager shall not be required to manage the Company as the Manager's sole and ***exclusive*** function and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or ventures.

(*See* ECF #9-9 at 12) (Emphasis added).

The arbitrator then eliminated the word "***exclusive***" from Section 5.13 and determined that this provision:

> thereby ***eliminates*** in respect of Manager Vikas Verma ***the existence of any fiduciary duties*** and liabilities to Respondent, specifically the embodied duty of loyalty and the avoidance of conflicting interests arising out of any of Vikas Verma's business interests in respect of Claimant Univabs and arising out of any of his activities related to those business interests of Claimant Univabs.

(ECF #6-1 at 22).

30

By completely removing the word "exclusive," the Arbitrator rewrote the Operating Agreement, and concluded that Verma had **zero** fiduciary duties to, and no confidential relationship with TRG. (ECF No. 6-1 at 26 & 28). The arbitrator found that Section 5.13 "clearly and unambiguously" provided Verma a relative "*carte blanche*" in how he was to carry out his "duty." (ECF No. 6-1 at 21). Finding that no duty at all existed is not an interpretation in any way, shape, or form. It is simply the elimination of an express modifier to the operative noun, with no authorized basis for its elimination.

Courts typically determine whether an interpretation occurred by looking at the arbitrator's reasoning. *See Original Appalachian Artworks, Inc.*, 718 F. App'x *at* 785; *Wiregrass* 837 F.3d at 1090. If the arbitrator "'attempted to give meaning to express terms—or discover implied terms—based on extrinsic evidence of the parties' intent,' that will ordinarily mean the arbitrator engaged in interpretation, not modification." *Original Appalachian Artworks, Inc.*, 718 F. App'x at 785 (quoting *Wiregrass* 837 F.3d at 1090).

In our case, the District Court listed two "hallmarks" that it believed proved that the arbitrator engaged in an interpretation. The Court specifically wrote that the arbitrator "noted that he was 'required by the law of Georgia and Georgia's public policy to give 'maximum effect'' to the freedom of contract" and also "sought to give effect to the intent of the parties." (ECF #30 at 12). The Court also

31

cited to O.C.G.A. § 13-2-3 (saying that "The cardinal rule of construction is to ascertain the intention of the parties."). (ECF #30 at 13). This arbitrator completely denied the parties' freedom of contract by re-writing the agreed upon language and acting contrary to the express intentions and understanding of the parties as reflected in the text and in Verma's own testimony.

"[A]n arbitrator cannot shield himself from judicial correction by merely *making noises of contract interpretation.*" *Anheuser-Busch, Inc. v. Local Union 744, IBT,* 280 F.3d 1133, 1138 (7th Cir. 2002) (internal citations removed).

That is precisely what the arbitrator attempted to do here. A look at what the arbitrator did, rather than what he said he did, shows that what occurred was a modification, not an interpretation. In fact, the arbitrator both rewrote the four-corners of the contract – decimating the freedom of contract theory – and also expressly ignored the intent of the parties as to Verma's duties.

### a. The Arbitrator Ignored the Express Intent of the Parties

Despite the District Court's contention that the arbitrator was merely reflecting the parties' intentions, the arbitrator in fact went out of his way to rule in a way that was contrary to everything the parties had told him their intentions were.

32

Not once did Univabs or Verma make the claim that Verma had no fiduciary duties to TRG. Quite to the contrary, on three occasions – each of which was with the arbitrator present – Verma stated that he knew he had fiduciary duties to TRG.

During depositions of Vikas Verma[4], given as part of the arbitration, the following testimony was given:

> Q. Correct?  Okay.  That's all I'm getting at. And at the time, you were also majority shareholder, officer, director of Univabs?
> A. That's correct.
> Q. Correct?  **You understand that while you were a manager of TRG**, **you had fiduciary responsibility to the company and also to its members?**
> A. **Absolutely.**
> Q. Right.  And at the same time, you knew that you had the same responsibilities to Univabs?
> A. That's right.

(ECF #9-7 at 311) (Emphasis added).

Verma further testified at a second deposition, also conducted with the arbitrator present, as follows in two separate instances:

> Q. You understand and admit that while a manager at TRG, you had fiduciary responsibilities to both TRG and Univabs at the same time?
> A. Yep.  Absolutely.
> Q. Right?  And you claim to be equally dedicated to both TRG and Univabs, right?
> A. Yes, sir.

---

[4] During each example used here, Verma was the one being deposed. His answers are marked by the letter "A" preceding them.

(ECF #9-8 at 40).

> Q. All right.· So going back to the – this September
> analysis, right?· You acknowledged that you had an equal
> fiduciary duty to both TRG and Univabs, right?
> A. Yes.

(ECF #9-8 at 50-51).

Additionally, even after the arbitrator's ruling, Univabs' District Court filings continue to reflect its belief that Verma had fiduciary duties, even if they were non-exclusive. (*See e.g.,* ECF #24 at 3, including a bolded heading stating "Mr. Verma Invests in TRG and Becomes a TRG Manager with Non-Exclusive Fiduciary Duties […]").

TRG knew that Verma, as a businessman, invested in many different companies much as he had done with TRG. That was the reason that he did not have an exclusive duty to TRG. TRG wanted to allow him the ability to invest elsewhere as he pleased without having to worry about whether part of that other company's business conflicted with part of TRG's.

That is why Section 5.13, in removing Verma from the list of Managers with exclusive duties, specifically said "a Manager shall not be required to manage the Company as the Manager's sole and ***exclusive*** function and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company." (*See* ECF #9-9 at 12) (emphasis added).

34

Ensuring that Verma did not have an exclusive duty did not mean that Verma was to have no duty at all to TRG. That would not be logical. If that were the case then when Verma was excepted from the list of managers with exclusive duties, obviously, Section 5.13 would have been completely silent as to duties or would have expressly provided that he had no duties. Instead, the exception for him was that the duties he had and understood that he had to TRG were not exclusive. He could have duties as well to others which did not run contrary to or violate his duties to TRG. Indeed, all of the parties involved have filed court documents and testified to the fact that Verma had fiduciary duties to TRG. As the record reflects, the only person who seems to believe otherwise was the arbitrator William Schroder, and he simply exceeded his powers and authority and acted arbitrarily, capriciously, and in manifest disregard for the law and the parties' intentions.

The District Court was simply and demonstrably wrong in its determination that the arbitrator "sought to give effect to the intent of the parties." (ECF #30 at 12). The clear and unambiguous language of the operating agreement and Verma's sworn testimony reflects the "intent of the parties" on this issue in no uncertain terms – and their intent as expressed in the operating agreement and as admitted under oath by Verma was that Verma owed fiduciary duties to TRG at all times, and the District Court irretrievably erred in coming to the conclusion that there was any support whatsoever for any contrary understanding of the parties' intent and

35

understanding. That the District Court went so far as to stress that ascertaining the intention of the parties is a "cardinal rule" goes to show how important the arbitrator's failure to adhere to their intention was. (*See* ECF #30 at 13, quoting O.C.G.A. § 13-2-3). The District Court's clearly erroneous and completely unsupportable conclusion was wrong, was a modification, and must be reversed.

### b. The Arbitrator Ignored Georgia Law and Did Not Give "Maximum Effect" to the Freedom of Contract

As noted above and by the District Court, the cardinal rule of construction is to ascertain the intention of the parties – where the intention is clear, contravenes no rule of law, and sufficient words are used to arrive at that intention, "it shall be enforced irrespective of all technical or arbitrary rules of construction." O.C.G.A. § 13-2-3. "Words generally bear their usual and common signification." O.C.G.A. § 13-2-2(2).

By reading the four-corners of the document, all that can be inferred or "interpreted" is that TRG and Univabs explicitly wanted Managers who were not Anand Lalaji or Robb Kolb to be able to have interests and investments elsewhere. That is why that was explicitly included.

Section 5.13 reads "any Manager may have other business interests and may engage in other activities in addition to those relating to the Company." (*See* ECF #9-9 at 12).

It does not say that everyone other than Anand Lalaji and Rob Kolb are not bound by any fiduciary duties and may act to the detriment of TRG for their own personal gain. If the parties had intended for Verma to have no fiduciary duty to TRG, there would have been no need to include that he has "no exclusive duty." They would have written that he has "no fiduciary duties whatsoever to TRG."

Instead, the arbitrator read this narrow exemption from an "exclusive" duty to mean that Verma could sell TRG down the river as he pleased. In no way, shape, or form, is that something that could be interpreted from the four-corners of the document or from the multiple filings and deposition testimonies that made the arbitrator well aware as to what the intent of the parties was.

The arbitrator chose to ignore all of this and come to a different conclusion. By effectively re-writing the contract, the arbitrator fundamentally altered the relationship between the parties.

By removing the word "exclusive" from Section 5.13, the arbitrator constructed an arrangement that TRG (or any party or company in the whole world conducting a business) did not agree to and would never have agreed to. Under no circumstances can removing a material substantively modifying term from an agreement between the parties be deemed an "interpretation." The relevant language in the instant case is not subject to interpretation and removing a substantive modifying word out of the Operating Agreement is under no

37

circumstances an interpretation. It is the epitome of a modification. *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 742 (11th Cir. 2024) (A "contract should be interpreted to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.").

When all the facts and parties tell you one thing, and you instead remove clear language from a document and come to a different conclusion, that is not an "interpretation" – it is undoubtedly a modification.

As has been established, Georgia law is clear that managers of an LLC have fiduciary duties to the LLC and its members. *See e.g.,* O.C.G.A. § 14-11-305 and O.C.G.A. § 14-11-307 (establishing the duties of loyalty and care and prohibiting conflicting interest transactions).

In addition to the admission by Verma that he clearly understood that he owed duties to TRG, and the express language of the Operating Agreement effecting that agreement by memorializing that the duties exist, but are non-exclusive, the law and public policy reflected in the law clearly support this. The parties clearly contracted for Georgia law to apply. Section 7.6 of the Services Agreement begins as follows: "[t]his Agreement and the construction and interpretation thereof shall be[ ]governed by the laws of the State of Georgia,

38

U.S.A. This Agreement is made in Georgia and shall be governed and construed according to the laws of Georgia […]" (ECF #1-1 at 9).

Removing the word "exclusive" to find that there was no duty at all was not an interpretation of contractual language – it was an intentional disregard of Georgia law and of the material terms of a valid and enforceable contract and an impermissible modification of that contract. It was also a willful disregard for the uncontested and admitted fact that Vikas Verma had fiduciary duties to TRG. (*See e.g.,* ECF #9-7 at 311 and ECF #9-8 at 40 & 50-51).

By ignoring Georgia law on the matter, as well as the actual words contained in the Operating Agreement, the arbitrator did not give "maximum effect" to the freedom of contract. He did the opposite and completely ignored the parties' freedom of contract to come to his own conclusion. It would seem that the District Court fell prey to the arbitrator's "noises of contractual interpretation" instead of actually examining the arbitrator's actions. *See Anheuser-Busch* 280 F.3d at 1138. But "an arbitrator cannot dress his policy desires up in contract interpretation clothing; a wolf in sheep's clothing is still nothing other than a wolf." *Id*. at 1142 (internal citations removed). The arbitrator may have stated that he gave "maximum effect" to the parties' freedom of contract, but a closer look at what he actually did proves otherwise. Indeed, in disregarding the parties' expressed

39

intentions and understandings, the arbitrator acted arbitrarily and capriciously and in manifest disregard of the law and that certainly was the effect in this case.

### C. The Arbitrator's Ruling and the Decisions Related to That Ruling Could Have Far-Reaching Negative Effects

Permitting the arbitrator's ruling to stand would have devastating effects on future litigation involving severe breaches of fiduciary duty. Under the arbitrator's ruling, that the District Court affirmed, any operating agreement that provides for duties, whether exclusive or non-exclusive, and which the parties unequivocally understand provides for duties, if modified by providing that they are not exclusive, will be deemed to eliminate any fiduciary or other duty a person in a fiduciary position would have under the contract or as a matter of law.  That is not and cannot be the law. It literally would absolve every officer, manager, or other fiduciary of any and all duties, including the long-established fiduciary duties of loyalty and to maintaining corporate secrets and confidential information, with a license to use such information for personal pecuniary gain to the extreme detriment of the company served by the fiduciary. In the instant case, it means allowing Verma, a manager of TRG made privy to corporate secrets and other information only because he was given a trusted position subject to the duties he and TRG expressly contracted for and understood to apply, to use such secrets and information for his own gain and to the severe financial detriment of TRG, without any repercussions.

40

As has been discussed above, not only does it ignore all of Georgia statutory and case law relating to fiduciary duties, it also would make enforcement against violations of fiduciary duties nearly impossible. Surely that cannot be something that is allowed to stand.

**D. Under the FAA, The District Court Had the Authority to Modify the Award to Promote Justice and Should Have Done so**

The FAA provides that:

> In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—
> **(a)** Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
> **(b)** Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
> **(c)** Where the award is imperfect in matter of form not affecting the merits of the controversy.
>
> The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11.

As has been detailed above, there can be no doubt as to the misdeeds of Verma and Univabs in this case. Verma stole proprietary information from TRG, which he learned while in a fiduciary relationship and role with TRG, and used it to his and Univabs' financial advantage at a cost of millions of dollars to TRG.

41

Based on the record in this case, including the express terms of the operating agreement and the sworn testimony of Verma acknowledging the duties he clearly breached, the district court could have and should have set aside the arbitrator's award and entered judgment in favor of TRG. This Court should remand this case and direct the District Court to do exactly that based on the authority of 9 U.S.C. § 11 and the record developed below.

## II.    The District Court Failed to Properly Apply Georgia Arbitration Law

The District Court applied the FAA when the contract specifically called for Georgia law to apply. Section 7.6 of the Services Agreement states:

> 7.6 GOVERNING LAW. This Agreement and the construction and interpretation thereof shall be[ ]governed by the laws of the State of Georgia, U.S.A. This Agreement is made in Georgia and shall be governed and construed according to the laws of Georgia without regard to its conflicts of laws principles. All disputes, controversies or claims which relate in any way to this Agreement will be resolved by arbitration in Atlanta Georgia, by a single arbitrator appointed jointly in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitrator shall be knowledgeable in the area of information technology consulting. The arbitrator's award shall be final and binding, and judgment on the award may be entered in any court of competent jurisdiction but may only include damages consistent with the limitations in this Agreement.

(ECF #1-1 at 9).

42

This section expressly provides for Georgia law to control all matters relating to it. It also provides for any arbitration to occur in Atlanta, Georgia. TRG took this to mean that the Georgia Arbitration Act, O.C.G.A. § 9-9-1, et. seq. (the "GAA") should apply regarding whether to confirm and/or vacate the Award.

However, the District Court held that the Federal Arbitration Act (the "FAA") controls in this instance. (ECF #30 at 6). The District Court refused to entertain TRG's arguments made under the GAA and Georgia law as to why the arbitrator's award should be vacated. (ECF #30 at 8, "The Court thus only considers Respondent's FAA arguments for vacatur.").

As mentioned earlier, the District Court held that the FAA – and not the GAA – applies for three reasons. First, the District Court found that this case fell under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention. (ECF #30 at 6). Second, since the Convention applies, recognition of the award is a matter of federal, not state law. (ECF #30 at 7). The third reason was the Eleventh Circuit case *Gulfstream Aerospace Corp. v. Oceltip Aviation 1 Pty Ltd.*, 31 F.4th 1323 (11th Cir. 2022). (ECF #30 at 7).

In *Gulfstream*, the parties similarly included language stating that the contract would be governed by Georgia law in the same section that called for arbitration of disputes. *Id*. at 1328. The parties there also called for arbitration in

accordance with the provisions of the Commercial Arbitration Rules of the American Arbitration Association, much as the Services Agreement in our case does. *Id*. at 1329.

However, part of the Court's reasoning as to why the GAA did not apply was because the parties had directly compared its calling for Georgia law to apply with why a separate rule for the sale of goods should not apply. *Id*. The Court found that since the parties had contrasted Georgia law with a rule that did not relate to arbitration, clearly the parties had not been referring to arbitration when it called for Georgia law to apply. *Id*. ("because the CISG could not have provided standards for the review of the arbitral award, the clause suggests that the parties did not intend for Georgia law to supply standards for review of the arbitral award.").

It is on this key point that our Services Agreement differs. Our Services Agreement does not contrast its calling for Georgia law to apply with any other rules, statutes, or laws. It simply says that Georgia law shall govern.

If the GAA applies, the crux of TRG's argument, as detailed before the lower court, would focus on O.C.G.A. § 9-9-13(b). O.C.G.A. § 9-9-13(b) provides five potential bases for vacating an arbitration award. Two of those bases apply to our case. First, if there is "[a]n overstepping by the arbitrators of their authority or such imperfect execution of it that a final and definite award upon the subject

44

matter was not made." O.C.G.A. § 9-9-13(b)(3). Second, if there was a "manifest disregard of the law." O.C.G.A. § 9-9-13(b)(5).

When it comes to "overstepping" their authority under O.C.G.A. § 9-9-13(b)(3), the arbitrator "is not free to ignore the terms of a valid and enforceable contract." *Sweatt v. Int'l Dev. Corp.*, 242 Ga. App. 753, 755 (2000) citing *Banderas v. Doman*, 224 Ga. App. 198, 201 (1997).

In our case, the arbitrator rewriting the agreement by deleting and disregarding the word "***exclusive***" constitutes an evident and intentional disregard for the plain language of the contract, thereby constituting an overstepping of authority.

For manifest disregard of the law, a party must present "evidence of a specific intent to disregard the appropriate law." *Wells v. Wells-Wilson*, 360 Ga. App. 646, 668 (2021), quoting *ABCO Builders v. Progressive Plumbing*, 282 Ga. 308, 309 (2007). The "disregard must be both evident and intentional." *ABCO*, 282 Ga., at 309. This is a high standard, as "a party wishing to have an arbitration award vacated must provide evidence of record that, not only was the correct law communicated to an arbitrator, but that the arbitrator intentionally and knowingly chose to ignore that law despite the fact that it was correct." *ABCO Builders, Inc. v. Progressive Plumbing, Inc.*, 282 Ga. 308, 309 (2007).

45

In our case, we know that the arbitrator was made aware of the relevant Georgia law relating to LLC's and fiduciary duties because the arbitrator states as much in the award. (*See* ECF #6-1 at 9-10). Under Georgia law, "[w]ords generally bear their usual and common signification." O.C.G.A. § 13-2-2(2). Nevertheless, the arbitrator ignored all of this and instead chose to remove the word "exclusive" to come to a different conclusion.

Furthermore, "[t]he cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." O.C.G.A. § 13-2-3.

As established above, the parties were clear in their intent that Verma had fiduciary duties. (*See e.g.,* ECF #9-7 at 311 and ECF #9-8 at 40 & 50-51).

The arbitrator's actions constituted an intentional disregard of the material terms of a valid and enforceable contract, intentional disregard for the written and stated intent of the parties, and an impermissible modification of that contract under Georgia law.

TRG would ask that this Court remand the matter back to the District Court with directions to reevaluate the case under the GAA.

## Conclusion

Clearly a grave injustice has occurred here. Verma took advantage of TRG and exploited them and their trust for his own personal gain, causing a tremendous loss of money to TRG through overcharging them for services. Permitting the arbitrator to cast aside and ignore all Georgia law on fiduciary matters only adds insult to injury.

Based on all of the foregoing and the decisions and statutes cited herein, TRG respectfully asks that this Court reverse the decision below and vacate the arbitrator's award under the FAA. Absent that decision, TRG would ask that this Court either modify the award under the FAA, or remand the case back to the District Court with instructions that they are to apply the GAA instead of the FAA and reinstitute TRG's counterclaims against Univabs.

Date: April 24, 2026

Respectfully submitted,

/s/ David I. Schoen
David I. Schoen
GA Bar No. 214789
Simon J. Schoen
GA Bar No. 718972
Schoen Law Firm, LLC
3151 Maple Drive, NE
Atlanta, GA 30305
Tel: (404) 365-5042
Fax: (917) 591-7586
schoenlawfirm@gmail.com
simon@schoenlawfirm.com
*Attorneys for Appellant The Radiology Group, LLC*

47

## Certificate Of Compliance

The foregoing complies with the permissible length of an opening brief as set out in FRAP 32(a)(7) in that, according to the word count performed by Microsoft Word, it contains 10,857 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ David I. Schoen
David I. Schoen

**Certificate Of Service**

I hereby certify that on April 24, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ David I. Schoen

David I. Schoen